## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

### Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for about 14 years, the last 5.5 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. §

841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices and its contents:

    a. **Subject Device 5**: Cream/Black, Samsung Galaxy Z flip-(smart) phone, IMEI 356816180169905.

**Subject Device 5**[1] was seized from Darnell SWAPSY's person at 157 Haymac, Kalamazoo, MI on May 5, 2022. **Subject Device 5** is currently in the custody of the Kalamazoo Valley Enforcement Team (KVET) in Kalamazoo, MI.

3. The applied-for warrant would authorize the forensic examination of **Subject Device 5** for the purpose of identifying electronically stored data particularly described in Attachment B.

4. I submit that there is probable cause to believe that evidence of Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C § 841(a)(1) and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g) will be found on **Subject Device 5.**

---

[1] Subject Devices 1-4 are identified in a separate continuation/application for search warrant with regard to devices seized from SWAPSY's brothers, Roy BUSH and Darius TAYLOR, at 1510 Krom St, Kalamazoo, MI on May 5, 2022.

5.  The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is probable cause for the requested search of **Subject Device 5** and does not set forth all of my knowledge about this matter.

## Probable Cause

6.  In the Spring of 2022, investigators with the Kalamazoo Valley Enforcement Team (KVET) and Kalamazoo Department of Public Safety (KDPS) Crime Reduction Team (CRT) began investigating Roy BUSH and his involvement in the distribution of large quantities of methamphetamine in Kalamazoo County, MI. KVET had also received information that his brother, Darnell SWAPSY, was involved in methamphetamine distribution.

7.  Specifically, on April 27, 2022, a KVET confidential source (CS) stated that he/she had been purchasing methamphetamine from a subject the KVET CS knew as "Flow." "Flow" is known to KVET/CRT as Darnell SWAPSY. The KVET CS further advised that he/she typically purchases between one to four ounces of methamphetamine from SWAPSY.

8.  On May 5, 2022, investigators executed a State of Michigan search warrant[2] at 1510 Krom Street, Kalamazoo, MI. During the execution of the search warrant, investigators located and detained Roy BUSH, his mother Tonya SWAPSY,

---

[2] On May 4, 2022, KVET Investigators Matt Slenk obtained a State of Michigan search warrant for 1510 Krom Street, Kalamazoo, MI signed by a Kalamazoo County 8th District Court Judge.

3

and his brother, Darius TAYLOR. Two juvenile children were also present. During the search of the residence, investigators located the following items:

    a. Packages of methamphetamine in the dresser, under the dresser, under the bed, and in a closet, totaling approximately 3,837.2 grams.

    b. Digital scale with methamphetamine residue.

    c. Empty Foodsaver bags with methamphetamine residue.

    d. 244 grams of marijuana.

    e. Two AR-15 style firearms with loaded magazines.[3]

    f. Documents/Mail/IDs for Roy BUSH.

    g. Other paraphernalia to include a measuring/cutting plate with methamphetamine residue and latex/nitrile gloves.

    h. Approximately $24,000 US Currency and a gold/diamond necklace & pendant with "LIK" lettering.

    i. Money counter in the living room.

    j. Plate and glass with suspected controlled substance residue in the kitchen and gallon Ziploc bags.

    k. Ammo in the second-floor west bedroom and basement.

    l. Loaded Tangfolio .40cal handgun in a 2020 Dodge Durango rental vehicle in the driveway.

---

[3] SWAPSY was prohibited from possessing firearms because of his prior felony convictions.

9. Contemporaneously with the search warrant execution at 1510 Krom Street, and team of KVET and CRT investigators, including a Michigan Department of Corrections (MDOC) agent, arrested Darnell SWAPSY at 157 Haymac, Kalamazoo, MI on an outstanding warrant for a traffic offense. SWAPSY was also on probation with MDOC which included a consent to search clause of his probation[4]. A compliance check was also to be performed.

10. SWAPSY was observed exiting 157 Haymac and arrested by investigators walking to his vehicle. Investigators located **Subject Device 5** in SWAPSY's hand.

11. Investigators then proceeded to attempt contact at the residence. SWAPSY began yelling at the residence that the police where there. As investigators knocked on the door, they could hear SWAPSY's girlfriend inside, but she did not immediately open the door. When she eventually opened the door and investigators entered, they noticed one kitchen cupboard open which contained evidence of drug distribution as well as a digital scale in the sink with methamphetamine residue on it. In this specific cupboard they located:

    a.    1.36 grams crack cocaine (KDPS Crime Lab tested).

    b.    3.98 grams of methamphetamine in a mixing bowl (KDPS Crime Lab tested).

---

[4] Darnell SWAPSY was on MDOC probation stemming from a 2021 Carrying a Concealed Weapon and Felon in Possession of a Firearm (felony) conviction in Kalamazoo County, MI. Condition 4.24: "You must submit to a search of your person and property, including but not limited to your vehicle, residence, and computer, without need of a warrant if the field agent has reasonable cause to believe you have items which violate the conditions of your probation." 157 Haymac was his approved residence with MDOC.

    c.    Plate with methamphetamine and fentanyl residue. (KDPS Crime Lab tested)

    d.    Large Ziploc with methamphetamine residue

    e.    Packaging material in the form of sandwich bags

    f.    38 special ammunition.

    g.    Firearm holster/bag

    h.    $440 US Currency.

12. During a search of rest of the residence, investigators located:

    a.    MSM container (known methamphetamine cutting agent) in another kitchen cupboard.

    b.    Black Ruger LCR 38 special revolver loaded handgun inside a black men's denim 3XL jacket in the closet of the second-floor northwest corner bedroom. (SWAPSY shows to be 6'1", 245lbs according to records databases).

13. Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a.    Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

    b.    Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to

communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

      b.      Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

      d.      Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

      e.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers.  These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

      f.      That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers,

safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

      g.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

      h.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

14. On May 23, 2022, U.S Magistrate Judge Phillip J. Green signed a search warrant (1:22-mj-00247) authorizing the search and examination of **Subject Device 5**. The warrant was required to be executed on or before June 6, 2022.

15. On May 23, 2022, I conducted a manual/physical review of the device however was unable to bypass the device's passcode. I and KDPS analysts attempted a data extraction of **Subject Device 5**, however an extraction was not supported by current tools/technologies available to KDPS/KVET. The phone was later turned over to the Michigan State Police (MSP) Computer Crimes Unit (CCU) in Battle Creek, MI.

16. On July 19, 2022, I received notice from MSP CCU that a data extraction of **Subject Device 5** was now available.

## Technical Terms

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for

9

viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from

10

at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.    IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

18. Based on my training, experience, and research, I know that the **Subject Device** has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of drug trafficking.

### Electronic Storage and Forensic Analysis

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

22. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Device** described in Attachment A to seek the evidence of drug trafficking and weapons offenses described in Attachment B.